

FILED
4/25/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

23cr253
Judge Lefkow
Magistrate Judge Fuentes
Randomly Assigned CAT 3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. |
| v. | ) | |
| | ) | Violation: Title 18, United States Code, |
| STANISLAV SANNIKOV, | ) | Section 1343 |
| aka "Steve Sannikov" | ) | |

The ACTING UNITED STATES ATTORNEY charges:

1.      At times material to this Information:

        a.      Defendant STANISLAV SANNIKOV, aka "Steve Sannikov," was an Illinois-licensed real estate broker and the owner and operator of a real estate company located in Chicago, Illinois, named Chestnut Realty Group.

        b.      Victims A through D were real estate investors who purchased or leased properties to renovate, rent, and sell for a profit.

        c.      A real estate purchase agreement is a contract in which a buyer agrees to purchase real property from a seller.

        d.      An assignment agreement is a real estate transaction in which the original buyer or lessor of a real property allows a third party to take over the buyer's or lessor's rights and obligations under a purchase or rental agreement, before the original buyer or lessor closes on, and takes possession of, the property.

        e.      Escrow is a legal arrangement in which a third party temporarily holds money or property until certain previously-agreed conditions have been met.

1

2.      Beginning in or around 2016 and continuing through in or around 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

STANISLAV SANNIKOV,
aka "Steve Sannikov,"

defendant herein, knowingly devised, intended to devise, and participated in a scheme to defraud investors in real property, and to obtain money from those investors by means of materially false and fraudulent pretenses, representations, and promises, as further described below.

3.      It was part of the scheme that SANNIKOV falsely and fraudulently represented to potential real estate investors, including Victims A through D, that certain properties were available for purchase or lease ("Fictitious Investment Properties") and that he was engaged in negotiations to purchase or lease those properties on the investors' behalf.  In fact, as SANNIKOV knew at the time, the Fictitious Investment Properties were not available for purchase or lease, and/or he was not engaged in negotiations to purchase or lease those properties.

4.      It was further part of the scheme that SANNIKOV fraudulently induced multiple real estate investors, including Victims A through D, to deposit money into bank accounts that SANNIKOV controlled by falsely and fraudulently representing to the investors that (a) the Fictitious Properties were available for purchase or lease and required escrow deposits to purchase or lease, and (b) the bank accounts were escrow accounts controlled by legitimate escrow companies that would hold their money toward the purchase or lease of those properties.  In fact, those properties

2

were not available for purchase or lease, SANNIKOV controlled the purported escrow accounts, and SANNIKOV used the investors' money not to purchase or lease real estate, but to convert the funds to his own benefit and to conceal and continue his scheme.

5.     It was further part of the scheme that SANNIKOV created email accounts that contained names similar to the names of owners of the Fictitious Investment Properties; used those accounts to pose as the property owners and representatives and to correspond with himself regarding the Fictitious Investment Properties; and sent those fictitious email exchanges to investors, including Victims A through D.     Through these fictitious exchanges, SANNIKOV falsely and fraudulently represented to investors that the owners of the Fictitious Investment Properties were negotiating and agreeing to the sale or lease of those properties to the investors, when, as SANNIKOV knew, the property owners had no knowledge of the purported sales or leases and were not parties to the emails that SANNIKOV fraudulently created.

6.     It was further part of the scheme that SANNIKOV prepared and sent to investors, including Victims A through D, false and fraudulent purchase agreements, letters of intent, and other sales documents that purported to document an agreement to sell the Fictitious Investment Properties to the investors.     At the time he prepared and presented these documents to the investors, SANNIKOV knew that he had not

3

negotiated any agreement to purchase the Fictitious Investment Properties and he had falsified the paperwork related to the purported purchases or leases.

7.      It was further part of the scheme that, to induce investors to purchase the Fictitious Investment Properties, SANNIKOV falsely and fraudulently represented to investors, including Victims A through D, that he had negotiated an assignment agreement for the investors to reassign the properties to third parties at a profit, before the investors had even closed on or taken possession of the property, and presented assignment agreements to the investors. SANNIKOV knew at the time that no such assignment agreement existed, that he had falsified the assignment agreements and that the investors did not stand to make a profit on a purchase or reassignment of the Fictitious Investment Properties.

8.      It was further part of the scheme that SANNIKOV falsely and fraudulently represented to investors, including Victim C, that his real estate company, Chestnut Realty Group, maintained an escrow account that held in escrow money intended for the purchase of real property. SANNIKOV knew at the time that Chestnut Realty Group was not licensed to act as an escrow agent and the company did not maintain a legitimate escrow account, but instead held a business checking account controlled by SANNIKOV.

9.      It was further part of the scheme that SANNIKOV incorporated several entities with the State of Illinois ("Fictitious Escrow Companies") with names and addresses similar to the names and addresses of preexisting and legitimate escrow

companies and opened bank accounts that he controlled in the names of those Fictitious Escrow Companies. At the time, SANNIKOV knew that he controlled the Fictitious Escrow Companies' bank accounts and that the similarity between the escrow companies' names and addresses would falsely and fraudulently lead investors to believe that the Fictitious Escrow Companies' bank accounts were legitimate escrow accounts.

10.     It was further part of the scheme that SANNIKOV directed investors, including Victims A through D, to deposit earnest money intended for the purchase of the Fictitious Investment Properties into bank accounts that he controlled, including the bank accounts of Chestnut Realty Group and the Fictitious Escrow Companies. SANNIKOV knew at the time that the investors' made these deposits that the investors had not entered an agreement to purchase the Fictitious Investment Properties, that the money deposited into the bank accounts would not be held in escrow toward the purchase of those properties, and that he would instead use the funds for his own benefit and to conceal and continue his scheme.

11.     It was further part of the scheme that SANNIKOV created email accounts that contained names similar to the names of real estate investors, including Victim D, and used those accounts to pose as the individuals who had invested in Fictitious Investment Properties and to direct legitimate escrow companies and others to transfer earnest money that the investors had deposited into legitimate escrow accounts to bank accounts controlled by SANNIKOV.

12.     It was further part of the scheme that SANNIKOV created and registered fake email addresses using names and domains similar to the real names and domains of sellers and lessors, investors and assignees, which SANNIKOV used to make investors believe that negotiations were continuing and to make sellers and others believe that the investors had knowledge of and consented to purported terms of the deal.

13.     It was further part of the scheme that SANNIKOV attempted to conceal and concealed the scheme by (a) obtaining multiple loans in Victim A's name and without Victim A's knowledge or consent; (b) using the proceeds of those unauthorized loans to repay Victim A; and (c) falsely and fraudulently representing to Victim A that the proceeds of the loan were repayment of Victim A's escrow money. SANNIKOV knew at the time that the money he used to repay Victim A was not the Victim A's earnest money because SANNIKOV had improperly used that money for his own personal use and expenses.

14.     It was further part of the scheme that, when certain investors demanded that SANNIKOV repay earnest money that those investors had paid toward the purchase of a Fictitious Investment Property, SANNIKOV attempted to conceal and concealed the scheme by giving that investor earnest money that a different investor had paid toward the purchase of a different Fictitious Investment Property or proceeds from loans taken out in Victim A's name.  SANNIKOV knew at the time

6

that the money he used to repay investors was not the investors' earnest money because SANNIKOV had improperly used that money for his own personal use and expenses.

15.     It was further part of the scheme that SANNIKOV concealed, misrepresented, and hid and caused to be concealed, misrepresented, and hidden, the existence and purpose of the scheme and the acts done in furtherance of the scheme.

16.     As a result of the scheme, SANNIKOV caused at least four investors, namely, Victims A through D, to suffer losses of at least approximately $3,021,481, including approximately $1,862,481 from Victim A, approximately $350,000 from Victim B, approximately $319,000 from Victim C, and approximately $490,000 from Victim D.

17.     On or about March 26, 2019, in the Northern District of Illinois, Eastern Division, and elsewhere,

STANISLAV SANNIKOV,
aka "Steve Sannikov,"

SANNIKOV herein, for the purpose of executing the above-described scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an interstate wire transmission of approximately $100,000 from Victim C's account at Tennessee Bank & Trust to a bank account in the name of Chestnut Realty Group at JP Morgan Chase Bank, through the Federal Reserve System;

In violation of Title 18, United States Code, Section 1343.

7

## FORFEITURE ALLEGATION

The ACTING UNITED STATES ATTORNEY further alleges:

1.      Upon conviction of an offense in violation of Title 18, United States Code, Section 1343, as set forth in this Information, SANNIKOV shall forfeit to the United States of America any property which constitutes and is derived from proceeds traceable to the offense, as provided in Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

2.      The property to be forfeited includes, but is not limited to, a personal money judgment in the amount of approximately $3,021,481.

3.      If any of the property described above, as a result of any act or omission by SANNIKOV: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property, as provided by Title 21, United States Code Section 853(p).

MICHELLE PETERSEN    Digitally signed by MICHELLE PETERSEN
Date: 2023.03.25 22:25:23 -05'00'    for MP

ACTING UNITED STATES ATTORNEY