IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 23 CR 253 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| STANISLAV SANNIKOV, | ) | Chicago, Illinois |
| | ) | February 5, 2025 |
| Defendant. | ) | 2:00 p.m. |

TRANSCRIPT OF PROCEEDINGS - SENTENCING
BEFORE THE HONORABLE JOAN H. LEFKOW

APPEARANCES:

For the Government: MR. MORRIS O. PASQUAL
ACTING UNITED STATES ATTORNEY
BY: MS. SHERI H. MECKLENBURG
Assistant United States Attorney
219 South Dearborn Street, Fifth Floor
Chicago, Illinois 60604

For the Defendant: FEDERAL DEFENDER PROGRAM
BY: MS. MARY HIGGINS JUDGE
55 East Monroe Street, Suite 2800
Chicago, Illinois 60603

Also Present: MS. JESSICA COOK, U.S. Probation Office

Court Reporter: NANCY L. BISTANY, CSR, RPR, FCRR
Official Court Reporter
219 South Dearborn Street, Room 1706
Chicago, Illinois 60604
Telephone: (312) 435-7626
bistanyofficialtranscripts@gmail.com

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE CLERK: 23 CR 253, USA versus Stanislav Sannikov.

MS. MECKLENBURG: Good afternoon, Your Honor.

Sheri Mecklenburg on behalf of the United States.

THE COURT: Good afternoon.

MS. JUDGE: Good afternoon, Judge.

Mary Judge on behalf of Stanislav Sannikov, who is present.

THE COURT: Good afternoon.

And, Mr. Sannikov, good afternoon.

THE DEFENDANT: Good afternoon.

MS. COOK: Good afternoon, Your Honor.

Jessica Cook from probation.

THE COURT: Good afternoon. Let me first thank you for your very helpful report, Ms. Cook.

MS. COOK: Yes.

THE COURT: I didn't quite catch your name.

All right. So, Mr. Sannikov -- well, first, let me ask, are we ready to proceed on this?

MS. MECKLENBURG: The government is ready, Your Honor.

THE COURT: I'll tell you right now, I'm not absolutely certain I can do the restitution amount with all this controversy, but I wanted to hear argument.

MS. MECKLENBURG: That's all right.

THE COURT: And I understand that you have a victim

witness.

MS. MECKLENBURG: We have a victim here today, Your Honor, yes.

THE COURT: Okay. Does the victim wish to speak?

MS. MECKLENBURG: Yes. Mr. Melamed is here today, and when it's his turn, he would like to step up and speak to the Court.

THE COURT: Okay. Just a moment.

All right. Mr. Sannikov, as you know, you are here for sentencing in this case in which you pleaded guilty awhile back.

So I will first tell you that I have read the materials that have been submitted on this case. So, you know, I think I've done my homework.

So I want to ask you if you have read all the materials?

THE DEFENDANT: Yes, Your Honor, I have.

THE COURT: And did you go over it with Ms. Judge carefully?

THE DEFENDANT: Yes, Your Honor.

THE COURT: So I will see if there are any objections to the findings in the presentence report and then make your guidelines calculation.

Then I'll ask your attorney to speak on your behalf. Ms. Mecklenburg for the United States will have something to

say, I'm sure. And then before I impose a sentence, I will give you the opportunity, if you wish, to say anything to me directly that you would like to say?

THE DEFENDANT: I understand.

THE COURT: All right. And if at any time you would like to speak with your attorney during this hearing, just let me know that, and I will allow you to do so, of course.

MS. MECKLENBURG: And, Your Honor, just -- and then after I'm done speaking, I assume you'll hear from Mr. Melamed.

THE COURT: Yes.

MS. MECKLENBURG: Okay.

THE COURT: Oh, right, yes. We'll hear from him, too. We can hear from him at any point you think.

MS. MECKLENBURG: Whenever you want, Your Honor.

THE COURT: Okay. Well, let's start with the presentence report.

Are there any objections to what has been reported? Let's not talk about conditions of supervised release but otherwise --

MS. MECKLENBURG: Not from the government, Your Honor.

MS. JUDGE: Your Honor, the defense agrees with the guideline calculation in the Presentence Investigation Report.

With regard to restitution, obviously there's a lot of issues in play here. So we don't have -- we are not in agreement to the calculations that they present.

One item I recommended or requested of the probation office this morning was on page 9, paragraph 33, the offense is described as the victims including robbery -- robbing them of money.

This is not a crime of violence, and it's not a robbery. And I don't want the BOP, who will get this, to use any reference to robbing or robbery while they're doing a security level for my client.

THE COURT: Right.

MS. JUDGE: And I advised that I could go through it much more carefully after I noticed one reference just to make sure there isn't any more in there, and I could give those to her to ask her to strike that if the Court orders.

THE COURT: Okay. Does that sound all right to you, Ms. Cook?

MS. COOK: Your Honor, just to be clear, at least that reference Ms. Judge just made in paragraph 33 she brought to my attention just a few minutes ago is information directly from the government's version, and that's how it's captured there.

THE COURT: All right. So --

MS. MECKLENBURG: What is said in the government's version, Your Honor, is that the victims described how he robbed them of their money, their time, their trust, and I listed some other things.

And I wasn't using the term "rob" as a robbery -- like

a strong-armed robbery --

THE COURT: I see.

MS. MECKLENBURG: -- but I think it was an accurate description.

If you want to have it changed in the PSR, I have no objection.

THE COURT: All right. I mean, do you really think it could be misunderstood as though we should change it?

MS. JUDGE: I do, Judge. I always feel like it's better to be safe than sorry. You just have to strike it. It's easy enough.

THE COURT: Okay. Can you -- Ms. Cook, can you give me a suggestion here or maybe you -- I don't know.

MS. MECKLENBURG: He took from them, Your Honor? I know you didn't ask me, but that's a very benign --

THE COURT: I appreciate that.

MS. MECKLENBURG: -- benign word.

THE COURT: Okay. He took --

MS. MECKLENBURG: He took from them their money, their time.

THE COURT: Just "took" is good, yes. All right.

MS. MECKLENBURG: It's pretty benign, but hopefully today you'll understand that it wasn't that benign.

THE COURT: All right. Anything else?

MS. JUDGE: Nothing else from the defense. Thank you.

THE COURT: All right. And I think there's no dispute that the guideline range is 57 to 71 months based on a criminal history category of II and an offense level of 24.

MS. JUDGE: That's correct, Judge.

THE COURT: All right. So, Ms. Judge, let me hear from you.

MS. JUDGE: May I respond to the government's, Judge? I think the government should go first.

MS. MECKLENBURG: I actually would prefer the way you're doing it, Your Honor. And I think Ms. Judge knows what I'm going to say, given that I've filed lengthy documents --

MS. JUDGE: Okay.

MS. MECKLENBURG: -- in this case.

MS. JUDGE: That's fine, Judge.

THE COURT: I always ask the defense to go first, because I like to give them the last word, but it doesn't matter to me. I'll hear from both of you.

MS. JUDGE: That's fine, Judge, since really issues in dispute are mostly related to restitution. I don't think we're going to get to restitution today, so I'm happy to go first.

MS. MECKLENBURG: And I don't mind if Ms. Judge responds to my restitution argument.

THE COURT: We'll talk about it.

MS. MECKLENBURG: Okay.

THE COURT: Okay.

MS. JUDGE: All right, Judge. I filed a sentencing memo in this case, and I'd like to start with a couple of things about what I encaptured in that and then elaborate somewhat.

This is -- starting with the history and characteristics and the nature and circumstances of the offense, I'm going to start with the offense first, because I realize it's very serious, and it's top of mind for the government, and I believe that's where they're going to start.

So my client has admitted to participating in a fraud from 2016 to 2020 and admitted to defrauding individual real estate investors resulting in an agreed-loss amount of $3.2 million plus.

I start with that, because although it's -- even though it's a significant dollar amount, it's also significant that he admitted to the loss amount up-front. In 2021, 2022 he spoke to federal agents who came out to see him and admitted to conduct, agreed to enter a plea of guilty to an offense that involved $3.2 million in loss, agreed to proceed by information and waive his right to have the case presented in front of a grand jury.

And he also in a rather, you know, unusual way agreed to waive the statute of limitations, because the government suggested that if he came in and cooperated, that would take some time. And we were willing to try to get him in to

cooperate, and that's why we waived the statute of limitations, so that they wouldn't be forced to go forward too soon if the cooperation agreement was going to be something that worked out.

And I think I explained I don't believe the attempted cooperation failed because my client was not believable. I believe the agents found him credible and met with him on multiple occasions, asking him a lot of questions about how he actually committed this offense, and he provided them with truthful information.

So it wasn't that he stopped halfway through or that he denied or that he minimized. He was truthful. It was just that, you know, as usual, what the government -- when a government gives someone a 5K departure, it's because it leads to the conviction of another person, either in the case or outside the case, and then they reduce it accordingly.

Well, they didn't have that information -- you know, they didn't have enough to call or charge anybody else, so it wasn't given a 5K departure. But my client was still truthful, and it's important because he was still willing to meet and answer questions even after learning that.

I mean, I did tell him that it's something that I would advise Your Honor, so there's a chance it could be held with some mitigation for him, but it wasn't going to result in a downward departure, but he was still willing to continue down

that path once he started.

During the time of the fraud from 2016 to 2020, the conduct was not all fraud. He wasn't someone who woke up one morning and decided to steal from people.

He ran a business. He was working hard on legitimate deals, and he committed fraud only when he began to fail and the bottom began to fall out.

And I think that's what happens in a lot of fraud cases. People start out, and either they get greedy or they are ashamed or they're embarrassed, but they can't stop the snowball effect, and it just keeps going, and it gets away from them.

But even in the Presentence Investigation Report, some of the victims were interviewed by the probation officer, and I think their comments are worth mentioning here.

According to Mr. Melamed, who is in court and planning to testify, he told the officer that he and Mr. Sannikov worked together. They developed, helped in the rental and purchase of condominiums and later apartment buildings. In total, he estimated that the defendant assisted in the rental and sale of approximately 15 condominiums and up to 4 apartment buildings.

So there was -- it wasn't an entirely fraudulent activity. He did have -- he started out in the right place. He definitely didn't end up in the right place, but it wasn't someone who set out to steal from people.

Mr. Will had similar comments that he knew the defendant was involved in legitimate real estate transactions before he began stealing from them.

So he is someone -- you know, he doesn't have a prior conviction for a fraud offense. This is his first offense, and that's something you can take into consideration, and the fact that when he was confronted, he made a full admission to the agents.

And one of the things that I will talk about with regard to the restitution is the chart that the government presented shows a column that shows all the payments that were repaid before the fraud was discovered and after the fraud was discovered.

I need a little clarification on the chart, so I'll talk to the government, and we can figure all that out for Your Honor at a later date. But it shows that he was working towards paying people back and in some cases was able to do so, and that's been reflected in the government's reduction. And then there's additional things that we are contending should further be reduced, but that's important, you know, that somebody before they were charged was making efforts.

And I don't think any of that's reflected in the presentence report or in the government's filings, because this is something that came to light a little later.

And given that, I think it's important to consider in

light of the recommendation from probation. They didn't have this information before they made their recommendation, and that's important.

(Telephone interruption.)

THE CLERK: Are we able to turn off the phone ringing, please?

MS. MECKLENBURG: If you can step out and turn off all your devices, that would be a good idea.

MS. JUDGE: Also, in the Presentence Investigation Report, Mr. Melamed states that he and his lawyer in 2017 met with my client, and my client admitted to what he had done and said that he was going to work on trying to get the money back to him.

With regard to my client's history and characteristics, as I stated in my sentencing memo, my client came to America when he was 12 years old. He was up until that age born and raised in the Ukraine, a war-torn country at the time, talked about what he saw, people getting killed, bloodshed, you know, very awful circumstances for a young boy at the age of 12.

You know, thankfully his parents had the wherewithal and the ability to bring him here. He has two parents who are alive now and a younger brother. He started high school here. He did not speak a word of English, and he said he taught himself how to speak English from watching TV and putting the

captions on.

While he was in school, even though he is a smart individual, obviously not knowing the language is a handicap, and so he had suffered some from kids making fun of him because he couldn't speak English and calling him stupid. And so there was some bullying at a young age, and he was in special ed classes even though he was not someone that had special ed needs if he knew how to speak the language and communicate properly.

So all of those things were hardships and things that Your Honor can consider.

Shortly after arriving here, after starting high school, after suffering from those various things and having those difficulties and not -- you know, not getting any kind of treatment or therapy or help from any agency to deal with what he saw before he came to the U.S. and then to help him, you know, get through high school, he ended up meeting kids and, you know, drinking and getting into drugs. And, you know, throughout his life he -- throughout his young life, he's had a bit of a drinking problem. He has DUIs in his background.

He is sober right now, and he has been since I've known him or at least shortly thereafter. And it's something that he is working on, and I think it's something that he necessarily has to work on to continue to be successful.

With regard to the nature and circumstances of the

offense, I believe I have addressed a lot of that, but one other thing I would like to say is, this fraud amount is based on the admitted loss of 3.2 million. That drives the guidelines substantially.

The fact that one of the victims had to sell property resulted in a two-level enhancement for my client and another enhancement that was not considered at the time that we filed our sentencing -- I mean, our predeclaration.

So the guidelines currently encapsulate a lot of the conduct that this Court will be considering today except for a lot of the mitigation.

And, you know, we don't have a dispute with the 3.2 loss. We've admitted that all along. We don't have a dispute that the conduct is, you know, illegal, fraudulent, and deserving of punishment. But we ask Your Honor to consider my client, the fact that he doesn't have any prior convictions of this similar nature, the fact that he's in a criminal history category II, we ask you to consider that one of the prior convictions is from many years ago. I think it's from when he was 23, and he's in his 40s now, and it's a misdemeanor, but it counts for that one. And that one point and that one offense puts him in a category II instead of category I, which results in a guideline increase.

I have that marked here. I can tell you which conviction it is.

It's paragraph 67, a theft in Cook County in 2006, and he receives one point even though it's -- it was a misdemeanor charge, but it does have an impact. His guideline calculation goes up because of that.

With regard to the amount of mitigation in this case, as the government's records show, he paid a substantial amount of the fraud back to the victims prior to being charged in this case. In the days when we used to have downward departures, we would ask for something like extraordinary acceptance of responsibility or a reduction based on the fact that he made, you know, a significant -- maybe even close to a third of the total loss paid back.

We don't know what the bottom-line figure is. It's still up in the air at this point, but we know that it's at least, I think, close to 800,000 that the government is agreeing to or 850,000. And that's substantial, and that conduct shows remorse and shows that my client is aware and knows that what he did is wrong, and it impacts the amount of deterrence that is needed, specific deterrence in his case.

As I mentioned, he met with the agents to cooperate and did so on numerous occasions. Agreeing to waive his right to a trial, I know a lot of defendants plead guilty, but in a fraud case of this amount, it's really a substantial -- it eliminates a substantial burden on the government to not have to put on a trial of $3.2 million and to lay all that

information out.

I mentioned in my sentencing memo the collateral consequence that could be extremely serious here, which is that my client's parents live here and his brother lives here, and he's lived here since he was 12, and he is not a United States citizen. He was lawfully here at the time of this offense, but there's a very good chance that he will be deported. And that is a significant punishment that is not considered under the guidelines in this fraud prosecution.

May I have a moment to talk to my client?

THE COURT: Yes.

(Defense counsel conferring with defendant.)

MS. JUDGE: All right, Judge. Thank you. I will probably have something to say, perhaps.

THE COURT: All right. Well, when we get into this issue of restitution, I think we'll sort of set that aside for now, but I do want to talk about it later on.

Ms. Mecklenburg.

MS. MECKLENBURG: Yes, Your Honor. What Ms. Judge said about the defendant -- when the agents knocked on his door, he did get a lawyer, and he came in, and he agreed to plead to an information, and he tried to cooperate. And his cooperation was not -- we were not able to use it. But everything that Ms. Judge said about that is accurate, so I want you to know that.

But we disagree -- the idea that he was working toward paying the victims back all this time is a complete mischaracterization in the view of the victims and the government.

So let me start with -- I have filed a lengthy sentencing memorandum. I filed a lengthy government's version with a lot of factual information, so I'm just going to briefly summarize the facts.

And I'm going to start with taking note that probation in their report said that the -- I don't know the exact words -- but the sophistication and the elaborate means of this fraud were unusual even for a sophisticated fraud scheme.

The facts are egregious. I mean, the defendant devised a scheme where he targeted individuals who were not strangers to him. These were business -- individuals who were business associates who trusted him. He targeted individuals who were small businessmen, not big companies. He developed a relationship with them. He developed their trust, all the while he set them up for fraud pretty much from the beginning.

While he had some dealings with them on other matters, as soon as he started this whole "Let's buy this property and then let's resell it quickly or lease it all out," none of that was ever true.

He gave them -- let me back up.

Mr. Melamed, who is here and he'll exercise his right

to speak, but he told me early on that he went along with all of this with defendant as far as he did because he knew the defendant, and he wanted to help him and do deals with him because he was young. And he said to me, "And I had hoped that together we would make money."

But the defendant devised this scheme that these were not just deals that he couldn't keep up with so he started robbing Peter to pay Paul like we see a lot. No, these were deals that never existed.

Like he would say to a victim: "We're going to buy that property. I'll get a contract to buy that property for" -- and these are just numbers I'm making up right now -- "but $1 million. And then I have a sale document to someone else for 1.5 million, and we'll flip it quickly."

And so then he would send them this contract to sell the -- to buy the property for a million dollars. Did not exist. He made it up. It wasn't -- that property wasn't on the market, and the person who signed it, that wasn't true.

And then his other document that he would show them, the document to flip it to someone else for more, also didn't exist.

So this wasn't a question of "I have all these deals going, and I'm hoping they pay up." He knew going into it he didn't even have the properties. He was making up documents and making up signatures.

He took the victims' money by setting up false escrow accounts. He used names similar to existing escrow accounts, which is very clever if you want to dupe, if you want to be deceitful to the victims. He told the victims that the money was safe in escrow.

Just for one example, on February 3rd, 2017, he told Mr. Melamed in an email that his money was being put in escrow, "So no risk of losing it." But the money was not being put in escrow. It was being put directly into defendant's own bank account where he used it for himself.

He presented fake deals to them. He kept the deals going by -- and he kept taking money from them by pretending -- by taking all these roles on as the seller, the lessor, the buyer, the attorney for the buyer. He pretended to be all these people, and he did this buttressed by taking fake email accounts with fake domains that were close to the company domains. And then he pretended to be all these different people, but it was him talking to himself, and then he would forward it to the victims.

He actually at one point even faked a fraudulent email exchange between himself and an official at the Federal Reserve Bank. Mr. Will was asking for his money back, and he was -- the defendant was claiming that he can't get it back because the government is holding it -- and there were various explanations -- because of a deal he was doing with a Russian

guy. That's a quote. And then -- but also when Mr. Will was demanding a return of his earnest money on a building that he was supposed to purchase, the defendant claimed that the funds were frozen by the Federal Reserve. And he created a domain, "fedreservechicago.org," which is not the Federal Reserve, and then he want back and forth with himself talking about how he was trying to get the money back from the Federal Reserve. All fake.

And the defendant's characterization of the scheme as just in over his head and trying to keep it afloat is disingenuous, and it does make me question his acceptance of responsibility.

I would like to briefly address the 3553(a) factors next. And I believe that the 3553 -- I have addressed them at length in my sentencing memorandum, and I won't redo it, I promise, but I want to highlight a few things orally.

First, as far as troubled childhood in Ukraine, that is something for the Court to consider, but that's not -- that should have motivated him to do well for his opportunities here. And in my memo, I held Mr. Melamed out as an example of someone who immigrated here and worked hard for years to do well. And Mr. Sannikov somehow thought this was all due him without any hard work.

In my experience, Your Honor, usually immigrants who come from tough, hard backgrounds come here with a motivation

to work hard, not of entitlement. And that's what I see in Mr. Sannikov today.

The defendant's background is troubling. His fraud started young. Even though Ms. Judge talked about his offense that was a misdemeanor when he was 23, when I read the facts, I thought it was very troubling. He was working for a retail store, a retail establishment, and he was stealing receipts out of their safe and then taking merchandise and bringing it back with those receipts. That's pretty brazen for a young guy, and that takes a lot of forethought.

So I don't think -- I think that was right then that started him in his willingness to be so deceitful.

I thought his physical batteries were very disturbing. I think he sounded like a bully who thinks that he can get what he wants by running over people, either physically or through deceit. He does have -- he has had problems with alcohol, according to the PSR. And whether he has conquered it or not, he certainly did, and it sounds like he might benefit from treatment still. But that doesn't account for what he did here, because this was carefully thought out over a lot of time, over years. This isn't something that you do just because you drank too much.

The courts often discount financial fraud, Your Honor; but whether you take someone's money with a gun or by an elaborate scheme like this, the victim still feels victimized,

maybe more so in a case like this when it is someone who they have trusted.

I'd also like to address the restitution. Would you like me to address it now or wait?

THE COURT: I would like you to lay out what your position is, yes.

MS. MECKLENBURG: Okay. I will. And then my last topic will be the victim and -- the victims, and then I'll be done.

THE COURT: Yes.

MS. MECKLENBURG: On restitution, the government calculated the restitution based on the money he took from victims less the money that he has personally paid back to them, that they have recovered from him.

The defendant claims he's entitled to certain additional credits. There's very little in dispute here, Your Honor, just some credits. And those credits, the defendant has the burden to prove that those credits should be given to him for purposes of restitution.

The defendant has not met his burden. There has been a lot of time, but he hasn't met it. And section 3664, which I cited to you in my brief, governs the criminal procedure for issuing and enforcing an order of restitution. And that section states that in no case shall the fact that a victim has received compensation from any third-party source be considered

in determining the amount of restitution.

So his restitution is not reduced by these -- by any lawsuits that the victims were forced to bring against other people.

That section also states that if the victim has received compensation from a third-party source and it is for the same loss as the defendant cause, then the Court shall order restitution to be paid to that third-party source.

So, in other words, the defendant doesn't get to step back and say, "Well, I'm done. I don't have to pay you."

THE COURT: Somebody --

MS. MECKLENBURG: He can't rely on the third party's payment to say, "That's credited to me. I'm done."

No, he has to pay the victims first and then any third parties back who paid the victims.

And then finally, this statute provides that any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss.

Now -- and I cited a number of cases to you, including Seventh Circuit cases, where the court said if you settled a case or you settled something before the order of restitution, you're just out of luck.

And I understand the concern about double recovery by a victim, but these courts -- this statute and the courts were

concerned with the fact whether a defendant was entitled to get out of his restitution obligations.

So the defendant has not presented the Court with even close to a level of proof necessary to meet their burden. We take the position that the restitution is due in the amount set forth in the government's amended version except that Ms. Judge recently brought to my attention a credit to Mr. Will for $49,250, which the defendant was owed by someone else, and he had it assigned over to payment to Mr. Will. And we agree that that should be credited, which would reduce the restitution to Mr. Will to 141,371. And it would reduce the total restitution amount to $2,199,217.

THE COURT: Okay. So there are -- what is the 16,000 from Sannikov's Chase account to Victim AW?

MS. MECKLENBURG: I don't know, Your Honor. And I've asked the victims.

THE COURT: Can you help me with that, Ms. Judge?

MS. JUDGE: That's my client paying that person back directly from his bank account to the victim.

THE COURT: Before when? When was this done?

MS. JUDGE: In 2021.

MS. MECKLENBURG: Which victim, Your Honor?

MS. JUDGE: Adam --

THE COURT: Adam?

MS. JUDGE: It was attached to my filing.

MS. MECKLENBURG: Okay.

MS. JUDGE: Let me just say this, Judge. One of the difficulties -- I mean, the government has the burden to establish who is owed restitution and why. And I understand the fraud loss is for guideline purposes, but restitution is a different issue. It may be the exact same, but it may not be.

The government is agreeing that at least 788,000 and now plus 50,000 was paid back to my client -- paid back to the victims. In the same breath, she's saying that my client was lying when he said he was working towards paying people back.

That $800,000 came from my client, so he was paying them back. There's no dispute about that, so I'm not really sure how to address that comment.

MS. MECKLENBURG: I haven't been able to address it yet, and I still hope to.

MS. JUDGE: What the government gave me is figures. So imagine like I -- Mr. Sannikov and I are going through the records, and we're pulling out, "Oh, here is a record that shows this amount of money was paid to this victim."

And then we present it to the government, but we aren't -- we aren't able to compare it to what the government is presenting to us, because they're just giving us a number and an address and some dates.

And it's really difficult to figure out what -- what conduct -- what they're attributing. They have columns --

clear columns of moneys paid back to the victim, but there's no identification of where that money came from or what that money was from.

So what I'm providing, is that a duplicate? I don't know. I just pull out what I see that is relevant that applies to an address that's already in their chart, but it's nearly impossible to figure it out when the government is just saying, "Here's a number" without more.

MS. MECKLENBURG: Your Honor, the defendant should know what he paid the victims and what he didn't. He has his own bank records. We've produced all the records, and we've produced our calculation of how we got there.

THE COURT: So I'm hearing two different, you know --

MS. MECKLENBURG: Let me address my final topic, Your Honor --

THE COURT: Okay.

MS. MECKLENBURG: -- about the victims, because I think that also goes to whether the defendant was trying to pay this all back, making a good-faith effort.

He claims that he should get a lower sentence because he had remorse, and he tried to pay the victims back. But it's not true. And actually, to the victims it was offensive.

I've spoken to the victims multiple times. They are very invested in this sentencing. Mr. Melamed is here. Mr. Will submitted a victim impact statement that was very

powerful. He talked about betrayal. He spoke about how that money was his lifeline, and he spoke about the impact that this had on him far beyond the financial injury that he suffered.

The victims have reached out to me and the agent multiple times about this case. I would like to read to you just one of the multiple emails that I got from them just yesterday when we received the defendant's reply brief. We passed -- I had the agent send it to them. And they sent me back an email, and here's part of what they said that is relevant. And I sent this previously to Ms. Judge.

Gary Stuart said, "Given there's" -- he disputes that he got certain restitution. And he says, "But given that there's very little chance I will recover any restitution, there is no reason to hold up his sentencing over this. But it's important for you to know and perhaps explain to the Court, also Sannikov is now trying to reduce his sentence because he was such a 'good guy' by returning money to Adam and me" -- Adam Will. "To the contrary, we had to fight and scrap, pay attorneys, and basically go through hell to recover the moneys, which we did over the course of years at great expense, time, and frustration."

And then Mr. Will wrote -- joined in, and he said, "Well said. This resonates with my discussion with Agent Carroll today and the memo I wrote." That would be his victim impact letter. "Until the very last moments, every second felt

like a struggle to secure any funds. In fact, on multiple occasions the amount he agreed to pay ended up being a small fraction of what it was meant to be. Unfortunately, no amount of returned money can compensate for the stress, time, and pain this has caused. I believe they are using funds unrelated to Steve and possibly double-dipping as well. Gary and I have spent an immense amount of time with Agent Conrad reviewing transactions, et cetera, to determine the figure."

So that is what the victims see, is whether he was such a good guy that he tried out of remorse to pay it back.

Now, I know that in a few minutes the defendant is going to get up, and he's going to have a turn to talk after Mr. Melamed and if Ms. Judge has anything else. And he'll undoubtedly talk about his remorse, and he'll undoubtedly talk about how he paid back the victims, and he tried to out of remorse.

But I want the Court to hear how he treated the victims when he thought nobody was listening when they asked for their money back. And at this time, Your Honor, I'd like to play in open court Exhibits 3 and 5, and the transcript is Exhibit 7 to the sentencing. And if you don't have it, I brought extra.

THE COURT: Is it on the record? I haven't read it but --

MS. MECKLENBURG: Pardon me?

THE COURT: The transcript, you say it's in the file?

MS. MECKLENBURG: Yes, it's Exhibit 7 to the sentencing agreement -- government sentencing memorandum. And I can hand you up a copy so that you can follow.

THE COURT: That will be great. Thanks.

MS. JUDGE: Do you have an extra one?

MS. MECKLENBURG: Let me make sure. Let me hand this up. I do.

MS. JUDGE: Thank you.

MS. MECKLENBURG: And if you give me a minute, Your Honor, to get this going. This is Exhibit 3, Your Honor.

(Audio recording played in open court.)

MS. JUDGE: Judge, can I just object for one minute? I have Exhibit 7. So if this is Exhibit 3 --

MS. MECKLENBURG: The transcript is Exhibit 7. This recording is Exhibit 3.

THE COURT: Okay.

MS. MECKLENBURG: So let me just get the volume where I want it.

MS. JUDGE: And if we could also hear before it starts, who is the conversation and the date.

THE COURT: Yes.

MS. MECKLENBURG: It's all in the sentencing brief that I filed, Your Honor.

THE COURT: All right. For those here in the

courtroom, maybe you could say who it is.

MS. MECKLENBURG: This is a conversation that Mr. Sannikov had with -- let me remember -- it was the girlfriend of, I believe -- let me just -- if you give me a minute, Your Honor. It's in my sentencing brief.

It was Gary Stuart's girlfriend who had introduced the defendant and Gary Stuart. And then at some point -- it might be the second conversation -- you'll also hear a man's voice, and that's Gary Stuart.

I just had it. Now it's not doing it.

(Audio recording played in open court.)

MS. MECKLENBURG: The defendant had given him his -- had given his watch to Mr. Will for, like, good faith supposedly.

(Audio recording continued playing in open court.)

MS. MECKLENBURG: And that was Exhibit 3, Your Honor.

Now I'd like to play the recording that was filed as Exhibit 5.

(Audio recording played in open court.)

MS. MECKLENBURG: I don't know why it's hard to hear now.

(Audio recording continued to play in open court.)

MS. MECKLENBURG: That was the real Mr. Sannikov, Your Honor.

In addition, I filed Exhibits 4 and 6 with my

sentencing memorandum where he sent a text -- it's undated, but it's his text to the girlfriend. And he said, "Let him know I know where he lives!!! Yes. That is a threat!! Go ahead and have the authorities address that!!!"

And then he sent another text on July 20th, so 5:00 p.m., pinning Mr. Stuart's home in Boca Raton and said, "How's Boca," which Mr. Stuart said he took as a threat. And there is no other way to take that.

So that's the real Mr. Sannikov. That's the way he treated his victims. That's not a person who has remorse and is telling the victims, "I'm trying to pay you back. I'm doing my best, and I'm paying you back."

That reflects exactly what Mr. Stuart and Mr. Will said, which is that every single step, when they tried to get money back, was a struggle.

This defendant had absolutely no remorse. He had no mercy for his victims, and he had no conscience for what he did at that time. The justice system requires mercy, but it also requires accountability. We cannot diminish society's interest in justice or the victims' pleas for justice, which I -- it's my duty to convey them to you for the ones who couldn't be here, and I hope that you understand what they're feeling. I hope I'm doing a decent job of letting you know how they feel about this and why this is important to them.

The government requests a sentence that considers both

mercy and accountability, a sentence dictated by the 3553(a) factors, a sentence that is sufficient but not greater than necessary. We ask for a sentence right in the middle of the guidelines range, which is 64 months.

THE COURT: All right. Do you want to respond to that?

MS. JUDGE: Yes, Judge.

We are asking for a sentence of 24 months, as I indicated, based on the essential -- essentially based on the original request, which was 36 months, reducing it by 12 months because of the significant amount of money that was paid back prior to my client being charged.

I'm not quite sure -- I still don't understand how the government is explaining how its position is he didn't pay it back and also saying that he is -- his restitution should be reduced almost a million dollars because they agree that he did pay it back. So I ask Your Honor to keep that in mind.

In addition, these phone calls are from five years ago, and they don't reflect who my client is today. I think he was in a situation where he -- you know, he was in this horrible situation in his life. He had just committed this fraud, and he was getting caught, and it's a terrible time. And that's reflected in the calls.

It's not who he is as a person, and it's not who he is today.

And lastly, with regard to restitution, I have the charts from the government, and I just want to focus on one victim, Melamed. And this is on page 1 of the government's summary of money transfers. The first transfer --

THE COURT: Will you give me the document --

MS. JUDGE: It's attached to my sentencing memo, Judge. I can bring one up to you.

THE COURT: Okay.

MS. JUDGE: All right. So there's an entire column that's called "Payment to Victim." And there is transaction -- well, I'll start: "Victim, Transaction Date, Transfer to SS," which I assume is my client, "Payment to Victim."

And then as you go down, you'll see a lot of payments to victim and a lot of transfers, but there's no explanation. Do they match up? Are they accounting for all of these payments that were paid to the victim? Are they reducing that? It doesn't match up. There's no totals on here.

From what I can tell, underneath that, when they have a green line that it says "Fraud Discovered," and then they have something classified as "Repayment," that's when they begin to deduct it from the restitution order, but it's unclear.

We just got a chart, and we got figures, and they keep changing. And so I really need clarification. In order for me to establish the payments that I'm suggesting my client paid in

addition, I need to know what the government is relying on.

THE COURT: So are you talking about dates or documents or payments? What are you --

MS. JUDGE: Like whatever they used to put the chart together, because I don't know what that is.

MS. MECKLENBURG: Bank records that we produced. And, Your Honor, the line that says "Fraud after" -- "Repayments after the fraud is discovered" --

THE COURT: Help me find that.

MS. JUDGE: It's the dark green line.

THE COURT: Okay.

MS. MECKLENBURG: That is not -- we didn't change that for the restitution. That affects the loss amount, not the restitution.

MS. JUDGE: Okay. Well, I just think if the government maybe could walk us through what everything means here, that might be helpful, because I don't -- it's not clear.

THE COURT: Can you do this together outside the court, I mean, so that we don't spend a lot of time here?

MS. JUDGE: Yes, Judge. I just think that's necessary before we can get to the next step of determining restitution.

You know, it's hopeful we can come to an agreement. We almost did on most of these things. There's just a few more, but I have to be able to really understand what they're doing in order to respond --

MS. MECKLENBURG: There seems to be like --

MS. JUDGE: -- to the rejection.

MS. MECKLENBURG: -- four or five items that they're contesting. So we can go through those outside of court, and we can come back for that; but in the meantime, I think that we should proceed with the sentencing today.

THE COURT: All right. The issue, of course -- I mean, there is the one argument that this should go to mitigation. So I suppose -- I mean, are you willing to go ahead with this despite that issue?

MS. JUDGE: As long as the government is acknowledging today that we're close to a million dollars or at least $850,000 and that the remaining amount is somewhat up in the air, could be an additional couple hundred thousand, maybe not, then I'm willing to go forward.

I don't know that we -- I mean, my point is he made efforts, and I think I can make that argument, and I have made that argument. And if Your Honor would prefer that we wait --

THE COURT: Well, you know, he's here and --

MS. MECKLENBURG: I'm willing -- I'm willing to agree that he made -- he did make some payments. Some payments were dragged out of him through legal means and other means, and the victims have recovered that amount. I'm willing to agree to that.

We're only in dispute on a few items that is reflected

in the memorandum filed last night.

THE COURT: Okay. So when you talk about collateral payments, these lawsuits, is that the victims sued what? They had insurance or something?

MS. MECKLENBURG: They sued other people who were involved in the fraud.

THE COURT: I see.

MS. JUDGE: So there's a co-defendant -- there's multiple defendants. My client is one, and there's two other participants. And they paid -- they settled and paid money to Mr. Melamed. And I believe the law is clear that that counts as restitution towards Melamed's loss if the government is counting the conduct that involved those three defendants in the restitution, but I can't tell what they're counting in the restitution. It's just numbers.

MS. MECKLENBURG: It's -- that's -- it's irrelevant, Your Honor. The money that others paid for their wrongdoing has nothing to do with what Mr. Sannikov owes for his wrongdoing.

Moreover, if it was a settlement before the restitution order, which it clearly was, it cannot be -- it cannot be counted. You don't have the authority to count it against restitution.

THE COURT: Yes, I understand that.

They weren't charged together?

MS. MECKLENBURG: The others were not charged criminally. It has -- it might be for a variety of reasons, knowledge, intent.

Mr. Sannikov is the one who created the scheme and if he involved others --

THE COURT: I see.

MS. MECKLENBURG: Yeah.

THE COURT: Okay.

MS. MECKLENBURG: Maybe they were negligent. It was a civil lawsuit, so it wasn't criminal.

THE COURT: Okay. Well, let's hear from your witness.

MS. MECKLENBURG: Yes. Mr. Melamed?

MS. JUDGE: I have one other thing to argue before we get to the witness, if I may.

THE COURT: All right.

MS. JUDGE: Very briefly. It regards -- it's regarding frauds, in general.

Frauds, in general, occur over a period of time. They're not like a bank robbery where somebody walks in and walks out. So multiple steps, multiple victims, multiple deception is part -- is part and parcel of every single fraud.

And that is what we have in this case as well. And I understand the government, for whatever reason, seems to take this very personally, but I ask Your Honor --

MS. MECKLENBURG: That's not appropriate to say.

MS. JUDGE: -- to consider this in light of all the other frauds that you have before you and all the other times that individuals who are charged with sentences -- charged and sentenced in frauds that involve a loss amount of $3 million. What's a fair amount of time for them to do, especially in the situation where they've never been in prison before and where they paid back a lot of the money that was stolen before they were charged and the fact that he tried to cooperate and was fully cooperative and did everything he could to help the government to bring this prosecution before the statute of limitations ran out?

Those are all things that are just being ignored by the government, and I'm asking you just to keep that in the back of your mind.

MS. MECKLENBURG: I have to respond for a minute, because I didn't ignore it. I started out by saying that's all true, and you should consider it.

But, first of all, the shot at me that I'm taking this personally is completely out of line. I've been nothing but professional here in doing my job, so I want that clear on the record. That was a ridiculous thing to say.

Second of all, Your Honor, in terms of the type -- that every fraud involves this kind of fraud, I've had a lot fraud cases that didn't. I've had some that were one shot, some that were three shots, some that were a short time, some

that involved like a simple fraud of one document was false.

This is unusual, and even probation noted it.

THE COURT: All right. Now let's hear from one of the witnesses, who has been very patient.

Good afternoon, sir.

MR. MELAMED: Good afternoon.

THE COURT: Would you state your name, please?

MR. MELAMED: First name Vladimir, last name Melamed.

THE COURT: Can you spell that?

MR. MELAMED: M-e-l-a-m-e-d, and the first name V-l-a-d-i-m-i-r.

THE COURT: All right. Go ahead.

MR. MELAMED: Before I make a short speech, I just want to say that I don't know what they're talking about. I never received one penny from Sannikov, ever.

I work hard all my life, and I decide to retire in 2016, 2017. It was my dream to retire in Arizona. I visited a number of times, Arizona. But instead of me, Sannikov retired in Arizona with my money, living in fancy condominium and having fancy lifestyle.

He left. He escaped from Chicago, end up in Arizona. And he left me and my lawyers to investigate tons of -- I'm sorry to use this word -- garbage that he left for us. The garbage included contracts for properties that never were on sale, but he stole from me deposits. He in 2017 found three

private lenders, one in New York, one in Lincolnwood, Illinois, and one mafia related, his friends, people from Moscow, from Russia.

From them he got $1,300,000. When they found out that we discovered that he was stealing money from us, somebody called me from Moscow, and that was for short conversation. They told me: "From Sannikov we know where you live, what do you do. We know everything about your four children, where they about, et cetera. You better pay within two months or you will suffer."

It's the first time in my life when I borrow money from the bank. I never borrow money in my life, but this time I used my property as a collateral, and I borrow money, and I paid those Russians so I never heard from them anymore.

Well, I arrived in the United States in November 1976 with three dollars in my pocket. I knew that I came to country of opportunities, and I start work as a masseur, taxi driver. You just name it. Then I learn some trades and saved some money.

And in 2013 I decide to invest money in real estate. I surrounded myself with good people, CPA, attorney, and construction person. All I need is someone who'd look for the property for me, rent it, and then eventually sell it. I saw couple of people. And then not too far from my place where I live, I found a real estate company called Chicago -- Chicago

Apartment Rentals, something like that.

When I entered, Sannikov come to me, and I explained to him what I'm looking for. He said, "Yeah, you came to the right place."

Later I found out that he was a trainee there. He was -- he didn't have a license. He was -- you know, first my condominium I bought through his manager.

In 2017 -- in August of 2017, 2017 my lawyer discovered that he was stealing money from me. All of sudden we discovered that I borrow money from private lender in New York. And my attorney said, "Why did you do it without telling me?"

I said, "I never borrow money from anyone."

Then we start digging, and I don't want to get in this, you know, all details, but then we found out that -- okay, he start helping me look for properties end of 2013, but already he starts stealing from me in 2014.

He had an agreement with the tenants for certain amount of money, and that was between him and tenants. And then he had to also show me agreement with a smaller amount of money. The difference he kept.

Then he start slowly growing and stealing larger amount of money, using his ideas, his scams, scenarios. Like in 2016, he stole from me $250,000 by presenting fake letter where he made out my signature at a closing, telling them that

I agree to give him 250,000, which will be deposited into escrow account. He never had escrow account.

This same year he open fake companies, and Ms. Prosecutor told already you, similar names to Chicago Title Services and Affinity Title. I forgot the name. So he had a similar name, the same letterhead, the same phone number, and the same even bank, Chase, which they have, those organizations. But the account was his.

So whenever he present to me paper for paying deposits, it was about 10, 11 times when he was involved in wire fraud. He presented to me accounts, and I knew it's escrow account, nothing to be afraid to deposit money there.

He did the same with the private lenders. I never knew about those private lenders. I never benefited from them. I only learn after they found out from him or from somebody else that he was stealing money, and we discovered. It was in 2017.

They start calling me and say, "We don't know where Sannikov is. You're responsible because he presented to us power of attorney." It was a fake power of attorney, which he used to borrow money, and he used my properties as a collateral, as a security to get money from them.

In this way, he stole from me. He borrowed for him, and he run away with those money. From guy in New York by the name Borkin, around $400,000. From people in Lincolnwood,

first he borrowed $400,000, and then with my money that he stole from me, he paid them back very fast. So he got a face with them. And then next day they borrow -- he borrowed from them $370,000.

And then I never saw this money. I never benefited from this money. And with Borkin, he just pick up. He is suing Sannikov. I don't know what is he doing down there, but he is not going after me to get his $400,000.

But another company in Lincolnwood, $370,000 now went up to $760,000. Why? Because they included -- they included legal expenses and interest. We're now in appeal. This year probably I hope the appeal will be ended, and the truth will be discovered.

With Russian mafia company, I already explained to you what's happened. But when they said to me that I have to pay them back or I will suffer, and I am originally from former Soviet Union. I know that you don't joke with those people. I went to bank, and from local bank first time I borrowed money. I borrowed $1,450,000. I still paying for those money. Of course, no retirement, you know. And my income from property that I have not enough, so I start doing my -- some additional consulting business, which I did before for international business.

The reason last year I sold one of my properties, and I lost income from rentals, of course, just to pay the bank

portion of the money. Now I still own them, and as I said, I don't know when I'll finish payments. Hopefully I will finish, not my children. I don't want leave them with any money to pay later.

I developed -- you know, it's hard to explain what's happened during this seven years. It was a nightmare for me, and not only for me, for my children as well and their spouses.

I developed depression. How you call it? I forgot. Not a sickness, and I cannot sleep without sleeping pills. Each time -- not each time but most of the nights I have a thinking -- I'm thinking about what he did. I hope he will deserve -- he will get what he need.

He -- okay. He did not hesitate to steal money from me whenever he could. There was a closing on one of my properties, and the title company made mistake for $6,850, BM Bank some. They -- he came. He took the check and simply deposit it to his account. That's it.

Then, you know, they now talking about some $75,000 which was deposited by buyer of one of my properties. $75,000 were deposited to Sannikov fake account. Even if they respond to reply -- like yesterday they put it on paper -- they said 75,000 were paid to Chicago Title. There is not such a company exists, Chicago Title. Either they do purpose or not, I don't know, but definitely it was deposit to his personal account. When two months later, buyer backed out from the sale -- from

the purchase, I had to pay 75,000, and I didn't have this money. I had to borrow money from a friend, and I paid the $75,000.

Yeah, once I was wealthy individual, kind of wealthy. Now I become kind of poor. Well, I have to work to make living.

His license -- real estate license was revoked. He not allowed to by Illinois Department of Professional Regulations. It was revoked because he was not allowed to do anything to do with the business -- real estate business.

They order to -- it was happened in 20 -- 2020. He was ordered to pay $250,000. He never paid them.

In 2021 Judge Walker admitted that he is guilty and ordered Stanislav Sannikov to pay me 1 million 220 -- 1,291,000 and his brother $212,000. Of course, they never pay anything.

Once, it was about 2015, he cried on my shoulder in front of my children saying that, you know, "I have a problem with my parents, with my father, with mother. I don't get along with them. You are closer to me. You are like my father."

My children suggest me to take him for (indiscernible), which I did.

After he -- after he -- Judge Walker admitted that he's guilty. After he knew that FBI looking after him, in 2022 he open a new company, EV Law Group. If you -- I mean, you

don't have to, but you can see sometime about what he -- how he promote himself, that he graduated from -- that he is a lawyer. He graduated from local law school here in Chicago.

Another company, which includes rentals, collecting rents, Maletisa Miller (phonetic) in Arizona was registered -- is registered -- I think it is registered in the name of his brother, Daniel Dan Sannikov. He is a resident of Illinois. He has nothing to do with Arizona, but his name Sannikov registered in Arizona.

The last thing that I learned about him that in May of 2023, the gentleman by the name Mohan Ramadan (phonetic) in Arizona start legal actions against him and his brother. I don't know if for what, but -- and I don't know what the result.

Sannikov destroyed my retirement. In my 70 I have to work as I worked in my 40s. He destroyed my wealth. I saved most money for my retirement. He destroyed my health. And the most very important that he -- before when I came to this country, 22 years -- 22 years old, you know, everybody smiling, everybody happy. You trust everybody.

He destroyed that trust. That's very bad and very sad, because my children also using many times worse. "Well, we cannot trust people. Sannikov is good example for us."

When he was invited to my celebrations, birthdays, whatever parties, he promote sales to my relative and friends.

In this way he stole $15,000 from my niece in 2019, I think, or '18, when (indecipherable) money back. He also stole money from my uncle, the same way, deposits for properties that did not exist. He stole $30,000 from my uncle. We never collected.

I think I said enough. I don't want to repeat something. But can I have one question for Sannikov, Your Honor? It's only four words.

THE COURT: Well, you may ask the question, but he doesn't have to answer.

MR. MELAMED: Oh, sure.

Where is my money? *Badla*. Thank you.

THE COURT: Thank you.

MR. MELAMED: Thank you.

THE COURT: All right. I think we ought to take a little recess. That was quite an emotional statement.

THE CLERK: All rise. Court is in recess.

(A short recess was had from 3:18 p.m. to 3:28 p.m.)

THE CLERK: All rise. Court resumes in session. You may be seated.

THE COURT: Yes.

MS. JUDGE: Do you want us to come back up?

THE COURT: Yes. Mr. Sannikov, why don't you come up with your attorney?

So, Mr. Sannikov, my responsibility, as I'm sure you

know, is to impose a sentence that is sufficient but not greater than necessary --

MS. MECKLENBURG: Judge, I think that Mr. Sannikov hasn't yet had an opportunity to speak to the Court.

THE COURT: Oh, you're right. You're right. I forgot. I beg your pardon.

Is there anything you would like to say, Mr. Sannikov?

THE DEFENDANT: There is.

THE COURT: Okay.

THE DEFENDANT: I want to start by addressing everyone here and thanking them for all the patience and consideration in this case, especially my attorney, Mary Judge.

Throughout this case I had a lot of time to reflect, learn a lot about myself through my past mistakes, which I'll be the first to admit have been quite a few. I have hurt people, people who were there for me, who were the closest to me. And while I know that nothing I say or do can make up for my past actions, I do want to acknowledge the hurt that I have caused and apologize to the victims. I'm sorry.

There are no excuses for what I have done, and I'm not here to make them. I'm here to take responsibility for my actions and acknowledge the unnecessary hurt that I have caused to everyone involved.

While I have many regrets about what I have done in the past, the one thing that keeps me going and motivated is

the knowledge that I can do better in the future. I admit I'm scared of what the sentencing means for my future, but I'm also optimistic that the sentencing can mark a beginning of a new chapter in my life, a life where I dedicate my time and energy to helping those around me.

My hopes for the future includes starting a family and being a positive role model in my children's lives. I hope to instill honest morals in my children utilizing my past mistakes to guide them as a parent. I hope to be able to continue to help my parents as they grow old and give them a comfortable life in their old age, as they have always provided for me.

Lastly, I intend to take this sentencing as a dedicated time to reflect more on myself internally, as I am clean and sober. I recognize the effects that drugs and alcohol had on my judgments and hope that my sobriety will lead to a better life for my family, friends, and those all around me.

Throughout these proceedings, I have lost the trust and respect of many friends and colleagues, which only further motivates me to be a better version of myself for the few important relationships that I have been able to maintain. Thank you.

THE COURT: As I started to say, Mr. Sannikov, it's my responsibility to impose a sentence that is sufficient but not greater than necessary to comply with the purposes of

sentencing. And as I imagine you know as well, that some of the purposes of sentencing, as you heard here today, is to reflect the seriousness of the offense, to promote respect for the law as well as to deter you and others who know about you from doing things like this as well as to provide you with any kind of treatment or education that might help you when you're released from custody to get on your feet and live a law-abiding life.

So let's start with the seriousness of the offense. I think your standing here today and having to listen to Mr. Melamed and how he feels about what you did lets you know how -- why our society punishes this kind of conduct. It's devastating to other people and really inexplicable in the sense that it just seems as though you absolutely set aside any moral compass and take other people's money without -- and then to continue to take their money even though you see what's happening and how desperate they may be.

You know, it's no surprise that people feel enraged. There's a man you know who has worked all his life, came from Europe as you did, you know, and you took his money. And the same with these other individuals who are part of this -- your conduct.

So, yes, maybe it was because you were feeling desperate and drinking and all of that, you know, but we don't -- you're responsible for your drinking. And if someone

kills someone because they were drunk in their car, you don't forgive them because they were drunk. They killed someone and were irresponsible.

And I think you refer to your mistakes. And, yes, they're mistakes, but when we think of a mistake, we think of doing something inadvertently. But these were really choices that you made every time this went along. So I want you to think about it that way as you go forward.

There a couple of things that -- I mean, I don't think I need to say more about respect for the law, because obviously that was no respect for the law, right?

Two things that are somewhat troubling. One is the issue of deterrence, not so much deterrence of others but to some extent, yes, but about deterrence of you because, you know, there was thievery in your background, and then this happened.

And I trust that after you serve a sentence that I will impose that you'll learn that this is not the way to go, but that temptation may always be there. People need money. They want money. They want to be successful. They want to be seen as successful. And the temptation is there, and it isn't that unusual that some scamming is going on.

So I feel that if someone is caught doing this -- many times they can't be caught -- you know, that there should be consequences.

There are some things in mitigation that I would acknowledge. One, that you waived indictment and that you were forthcoming. There's no indication you weren't forthcoming about your activity and what was -- you know, whatever you were asked, you provided as much as you could. So that's good.

It's also the first time that you have -- I think it was said the first time you have been subject to a prison sentence, and that's something that I can consider.

You're still a young man. You still have life ahead of you, and I don't think anyone wants your life to be totally ruined. I mean, maybe your victims do, but otherwise, we all know that some people mess up. You know, we all mess up to one extent or another.

Anyhow, I will say no more other than to say it seems to me that a sentence of 50 months in custody is sufficient but not greater than necessary to comply with the purposes of sentencing. I will defer the order of restitution as we've discussed earlier today.

Now, we have issues about supervised release as well. I understand there were objections to supervised -- the conditions of supervised release, Ms. Judge?

MS. JUDGE: I don't recall. Let me just quickly look. Sorry.

THE COURT: I know in your memo you said that we wouldn't need to impose some supervised release.

MS. JUDGE: Oh, right. That's right. Thank you.

5D1.1 of the guidelines says that an individual who is -- should not be sentenced to a term of supervised release because he's a deportable alien who will likely be deported after imprisonment. I bring that to your Your Honor's attention.

In the event the Court considers imposing a term of imprisonment -- a term of supervised release, Mr. Sannikov agrees to the mandatory condition of supervised release and to discretionary condition 14.

THE COURT: Agrees to one?

MS. JUDGE: Agrees to the --

THE COURT: The mandatory --

MS. JUDGE: -- mandatory and then to the additional condition that he has to be deported as part of, you know, the conditions. I've seen how judges have done that. You know, there's other conditions. We can discuss them.

THE COURT: Right. And as I recall, the response to that was, well, he is here legally, so it may take time for him to be, you know, removed from the country.

Is that -- do we know what will happen?

MS. MECKLENBURG: Nobody knows anything these days, Your Honor. The only thing I can tell you is that despite all the show that we've been seeing in the past few weeks, it is my understanding that those were people who were deported who

were -- had already been through the immigration court system and had orders to be removed or to leave, and they had not left. So they were not somebody who I anticipate will be in the same shoes as Mr. Sannikov.

What will happen when he serves his time and gets out is anybody's guess, but that's what I do know.

THE COURT: Well, have you gone over these, Ms. Judge, with Mr. Sannikov?

MS. JUDGE: I have not, Judge. I can tell Your Honor that I typically object to the portion that says that probation is going to visit him at work. If he's employed and he's got a job, I'd rather that he not be interrupted. But, you know, we've read them, but it's been awhile.

So if Your Honor wants to impose all the conditions that pretrial or probation recommended, I ask that you exclude that condition that they visit him at work.

THE COURT: Okay. Well, I understand the policy, correct me if I'm wrong anyone who is here -- Ms. Cook was here -- that they make arrangements, and they don't go to your place of work unless that's agreed to or that's the only thing that they can do. Is that right?

MS. COOK: That's correct, Your Honor.

THE COURT: So with that understanding, I would impose that condition as well.

Now, it may not be myself -- who knows when he is

released from custody -- but once he's serving supervised release, if there are conditions that you think need to be changed, they can come in for modification.

MS. JUDGE: Thank you, Judge.

THE COURT: So I'll impose those recommended by the probation officer.

All right. Let's see. I will not impose a fine. The order of restitution will be deferred to -- I don't know. How much time do you need to get that done?

MS. MECKLENBURG: I'm going to be -- Your Honor, I'm just going to tell you, I don't know why we're deferring it in that there's, like, five things that the defendant believes he should be credited with. Several of them are lawsuits.

I think you can rule under the law that I gave you that those do not get credited to restitution.

THE COURT: Okay.

MS. MECKLENBURG: And then for the others that are payments that Mr. Melamed said, "Well, I didn't get that" and there's another payment -- they gave you something that says, like, 16,000 to a company, and they've given you nothing else. And it's their burden if they think it was payment to a victim.

I have not gotten anything; and therefore, I think at this time you can rule that that has not been proven; and therefore, it's not credited against the restitution.

THE COURT: I mean, this is a figure that is unlikely

ever to be paid. So is there a way you could -- I don't know. How much is involved? How much is involved? I have that here in my notes.

MS. MECKLENBURG: Well, the lawsuits, I think you definitely can rule on.

THE COURT: Okay.

MS. MECKLENBURG: So we can put that aside. And those other payments --

MS. JUDGE: I disagree on the lawsuits as well, Judge. Can we just continue this for even a couple of days?

THE COURT: Yes.

MS. JUDGE: And then I can get a clear -- what the government is accepting, what they're not, what we're challenging, and then I can file something very quickly.

THE COURT: Okay. So --

MS. MECKLENBURG: I would just point out, Your Honor, this has been pending for a long time, and this is all --

THE COURT: Yes, I understand.

MS. MECKLENBURG: And I just don't know why. I mean, I put all of that about the lawsuits in over a month ago, and I think if there was an answer to it --

THE COURT: Well, look --

MS. MECKLENBURG: If not, I do think the Court can rule.

THE COURT: -- it could be, but let's just let

Ms. Judge --

MS. MECKLENBURG: Okay. You're correct.

THE COURT: -- make her position known, and I will try to understand it better.

But we agree that there's $49,250 that comes off.

MS. MECKLENBURG: Yes.

THE COURT: And your amount, Ms. Mecklenburg, is 2,199,217.

MS. MECKLENBURG: Yes.

THE COURT: And yours is --

MS. JUDGE: I think it was -- hold on, please.

MS. MECKLENBURG: And just for the record, Your Honor, I got there by what's in my amendment to the sentencing memorandum regarding restitution less the 49,250.

THE COURT: Thank you.

MS. JUDGE: I'm sorry, less the what?

MS. MECKLENBURG: The $49,250.

MS. JUDGE: So of any of the issues I raised there, that's the one that you're agreeing to?

MS. MECKLENBURG: Yes.

MS. JUDGE: Okay. Then I need to address all the others, Judge. I don't have my figure. I think it's 188,000 but --

THE COURT: Okay.

MS. MECKLENBURG: Yes, Ms. Judge provided me with an

assignment agreement on that 45,000 -- $49,000, so I agreed to that.

THE COURT: All right. So then now we need a surrender date, but is there anything else I need to cover?

MS. JUDGE: Just a date for determining the restitution, I guess. Should I just file it, and you'll respond in writing?

THE COURT: Yes. I'll give you a week. I'm starting a trial next week, so it may be hard to squeeze you in if we do need to come back to court. We'll see.

MS. JUDGE: I'll file it and assume it will be ruled on by mail, but if we need a hearing, then we can just schedule it after that.

THE COURT: We'll let you know. Okay.

MS. JUDGE: I'll file it by the 12th.

THE COURT: Okay.

MS. MECKLENBURG: If I need to file something in response --

THE COURT: Yes. Another week.

MS. MECKLENBURG: At the most. I'll try and get it done as quickly as possible, Your Honor.

THE COURT: So I will withhold the entry and judgment until that's resolved.

MS. MECKLENBURG: I believe there is a federal rule -- I know that Judge Tharp once used it -- that he could enter the

judgment and defer restitution, but it doesn't -- I don't know that it matters.

THE COURT: Okay. Sometimes that makes sense, too. Sometimes there has to be a hearing.

MS. MECKLENBURG: Yes.

THE COURT: All right. So I'll go ahead with the entry of the judgment, and then I will give you a ruling on the issue of restitution.

MS. MECKLENBURG: And then we just need a date for surrender, Your Honor.

THE COURT: A surrender date.

MS. JUDGE: Three months, Judge?

THE COURT: Is that all right? You disagree or object, Ms. Mecklenburg?

MS. MECKLENBURG: I think he should get whatever is standard in your courtroom, Your Honor. Nothing more, nothing less.

MS. JUDGE: I think if it's not three months, then usually someone isn't getting their letters in advance. If you want to do what -- if it's shorter normally, we can try that, but I think three months is reasonable.

THE COURT: Well, let's see. We're here at the beginning of February. So March, April -- that's May. That's awhile out. How about mid-April, April 15th or thereabouts?

That's a Monday there, Amanda.

MS. MECKLENBURG: Which day, Your Honor, April?

THE CLERK: April 15th, a Tuesday.

MS. MECKLENBURG: April 15th. Okay.

MS. JUDGE: All right. Thank you, Judge.

THE COURT: All right.

MS. MECKLENBURG: Thank you, Your Honor, for all this time. I appreciate it.

MS. COOK: Your Honor, if I may. I apologize if I missed it. You indicated that the conditions that probation requested for supervised release, just confirming the term.

Is it the two-year term recommended as well?

THE COURT: Oh, I don't think I said. Is that what was --

MS. COOK: That's what probation recommended.

THE COURT: Yes. All right then.

MS. COOK: Thank you for clarifying.

THE COURT: You do have the right to appeal the sentence I impose.

You do have the right to appeal the sentence I have imposed. If you wish to file an appeal, that must be done within 14 days, so be sure to discuss that with your attorney, Mr. Sannikov.

THE DEFENDANT: Thank you, Your Honor.

(Proceedings concluded.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/S/Nancy L. Bistany* *December 4, 2025*

______________________ ________________________

Nancy L. Bistany Date
Official Court Reporter